[No. B034560. Second Dist., Div. Three. Aug. 29, 1989.]

AMERICAN CREDIT INDEMNITY COMPANY, Plaintiff and Appellant, v.
LOLA N. SACKS, Defendant and Respondent.

## COUNSEL

Ervin, Cohen & Jessup, Allan Gabriel, Calvin E. Davis and Deborah A. Berthel for Plaintiff and Appellant.

Karns & Karabian and Lawrence Graze, Revere, Rykoff & Wallace, Frank Revere and Caroline Fowler for Defendant and Respondent.

## OPINION

**KLEIN, P. J.**—Plaintiff and appellant American Credit Indemnity Company (ACI) appeals an order of the trial court denying its application for a preliminary injunction against defendant and respondent, its former employee, Lola N. Sacks (Sacks), now doing business as LNS Insurance Services.[1]

The issue presented is whether, under the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.), Sacks may solicit ACI policyholders she serviced during her employment, or whether she must limit the use of ACI's customer list to an announcement of new affiliation.

We hold the UTSA protects ACI's customer list as a trade secret, and Sacks's solicitation of ACI's clients constituted a misappropriation within the meaning of the UTSA, and should have been enjoined by the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

ACI is a national underwriter of credit insurance. This esoteric insurance is sold to manufacturers, wholesalers and certain service organizations which sell on credit terms to other businesses, and is designed to protect an insured against excessive bad debts. As far as can be discerned from the record, only three firms write this type of insurance. ACI is a leader in the field, and in 1987 it had 42 offices which generated gross premiums in excess of $56 million.

ACI estimates that although any company in the described category of potential customers with annual revenues in excess of $2 million might insure its accounts receivable, only 6.5 percent actually do. ACI claims it has captured more than half of this market.

---

[1] An appeal may be taken from an order denying an injunction. (Code Civ. Proc., § 904.1, subd. (f).)

Sacks became an ACI agent on February 5, 1979. She formerly had worked in the toy industry and had been an ACI policyholder. By 1987, Sacks had become a top ACI agent. She personally serviced 43 of the 136 Los Angeles office policies. Although some of these policies had been "inherited" by Sacks when other ACI agents left the office, she had been the responsible salesperson on the majority. Some of the leads which resulted in policies written by Sacks had been provided by ACI; others Sacks had developed.

On March 4, 1988, Sacks resigned from ACI. She sent a letter dated March 7, 1988, to each of the approximately 50 ACI policyholders she personally had serviced. It stated: "After almost fifteen years as both an agent and policyholder, I have left [ACI] and am very pleased to announce the formation of an independent insurance agency. [¶] I shall continue to specialize in Credit Insurance but will now primarily be representing FIDELITY AND DEPOSIT COMPANY OF MARYLAND [F&D], who [sic] is offering companies a very interesting alternative to the types of policies being written by both [ACI] and Continental. If you would like to learn more about the [F&D] policy, I will be happy to discuss it in detail with you when you are ready to review your ongoing credit insurance needs at renewal time. [¶] In the meantime, ACI will assign a new agent to your policy. If I can be of assistance to you during the transition period or answer any questions for you at any time, please do not hesitate to call me. [¶] I have really enjoyed our past association and hope we don't lose touch!"

a.  *ACI's complaint allegations.*

On March 23, 1988, ACI filed a verified complaint against Sacks seeking injunctive relief which alleged Sacks had used ACI's " 'Trade Secrets' " to solicit ACI's clients.[2] The complaint defined as " 'Trade Secrets' " its client list, the expiration dates of ACI policies, lists of all leads for potential business, claims histories, and other information concerning the special needs of clients. ACI alleged it required its employees to sign confidentiality agreements with respect to this information.

The complaint further alleged that in the course of discovery in another lawsuit (the Wixom action), Sacks had received log books containing the names of approximately 3,000 ACI leads and clients maintained by ACI from 1985 through October 1986. In that case, Sacks had stipulated to a

---

[2] In addition to injunctive relief, ACI's complaint sought return of personal property, imposition of a constructive trust, an accounting and damages for misappropriation of trade secrets, unfair trade practices and competition, breach of fiduciary duty, intentional interference with business relations, and conversion.

protective order as to the log books.[3] ACI characterized the Wixom action as a suit for defamation brought by Sacks against a former ACI secretary.

### b. *Temporary restraining order (TRO) issued.*

Based upon the allegations of the complaint, the trial court issued a TRO which directed Sacks not to divulge, make known or make any use of ACI's trade secrets and not to solicit business from any person or entity which had been an existing ACI client during the time Sacks had been employed by ACI or any potential ACI client Sacks had become aware of as a result of her ACI employment.

### c. *Facts disclosed by subsequent discovery.*

After issuance of the TRO, the parties conducted expedited discovery which disclosed the following facts:[4] Sacks first contemplated leaving ACI in approximately April 1987. She began discussions with F&D in October 1987, and attended meetings at F&D's Baltimore headquarters in late January 1988. Sacks told F&D her ACI policyholders represented approximately $800,000 in annual premiums and "perhaps half of [those] policyholders might be interested in writing business with" F&D.

In February 1988, Sacks signed a lease and installed phone service at her new office but averred "until the last day as an agent with ACI (March 4, 1988) I properly serviced all ACI policyholders including but not limited to submitting policy renewal applications and obtaining new business. Indeed, between January, 1988 and March 4, 1988, I obtained 18 renewal applications for ACI and obtained three new applications for ACI, . . ." (Italics deleted.)

Sacks told several ACI clients of her possible association with F&D at the time she met with them for the purpose of renewal of their policies. Of these clients, she advised at least two to stay with ACI even though the clients wanted to follow her, and the great majority of these policyholders renewed with ACI.

---

[3] The parties had agreed certain "proprietary and confidential information belonging" to ACI "consisting of log books of leads from August, 1983 through the present, [would] be used only for the legitimate purposes of this [the Wixom] litigation [and] [t]hat said material will not be disclosed, discussed, copied, published, or made available in any manner whatsoever to persons other than the parties, their attorneys, and those with a legitimate need to know in order to assist in the prosecution or defense of this action and cross-action."

[4] The facts which are summarized hereafter are based upon Sacks's deposition and affidavits filed by ACI and Sacks in support of and opposition to issuance of the preliminary injunction.

Sacks claimed the March 7th letter had been "carefully drafted . . . to refute any charge of wrongdoing that might be brought by ACI." Sacks pointed out the letter specifically suggested waiting until renewal time before making any change in coverage and assured the client that ACI would continue to service the policy.

Although Sacks also telephoned each client to which she had sent the March 7th letter in order to convey a personal communication of her departure, she denied soliciting business or discouraging continuation of coverage with ACI during those calls.

One major policyholder with which Sacks had discussed her new affiliation decided to change carriers to F&D. This policy, which expired on March 31, 1988, accounted for approximately $230,000 in annual premiums or almost 30 percent of the premiums Sacks generated. Sacks admitted she had provided information about F&D to this client in a manner which differed from her earlier practice with respect to competitors, and in fact, acted as an intermediary on behalf of the client with F&D. However, she also wrote a letter dated February 6, 1988, to ACI's home office, in accordance with a written ACI policy, which advised ACI management of competition from F&D on the renewal of this policy. The purpose of the letter was "to see if [ACI] would be willing to change any terms on the renewal in light of the potential competition."

On February 23, 1988, approximately one week after Sacks told this client she intended definitely to join F&D, the client told Sacks it would not renew the ACI policy but would place its business with F&D. Although Sacks at some point in the discussions had referred the client to an F&D agent, Sacks earned a commission on the issuance of the F&D policy.[5]

Sacks admitted it is easier to renew a policy than to sell it in the first instance because a prospective client must be sold on the concept of credit insurance. Sacks renewed policies at a rate that ranged between 65 and 75 percent.

Sacks believed the sales leads produced by ACI belonged to ACI, but the sales leads she had developed belonged to her.

---

[5] In declarations filed in opposition to the issuance of the preliminary injunction, the executive vice-president and the credit manager of the client both praised Sacks's professionalism and accountability. Each denied Sacks had incited the switch to F&D and claimed the change had come as a business response to ACI's high premiums and poor performance on accounts receivable which, pursuant to the ACI policy, had to be assigned to ACI for collection. The executive vice president stated "that if any reputable agent had approached us . . . with the F&D proposal and concepts, I would have determined to allow the ACI policy to lapse and to pick up the F&D policy . . . ."

Regarding the log books, Sacks claimed the Wixom action, in addition to defamation, involved her claim ACI wrongfully had limited her acquisition of new accounts by depriving her of telephone leads. Sacks estimated the success rate on telephone leads at 20 percent. During her early tenure at ACI, Sacks had received 3 to 5 telephone leads per month which resulted in 10 to 12 new accounts per year. Sacks contrasted such leads with responses to direct mail which had a success rate of about 5 percent. Sacks claimed she had rarely received telephone leads after 1985.

### d. *The trial court's ruling.*

After two oral hearings on the application for the preliminary injunction, the trial court indicated it would consider all the evidence, including the deposition testimony, and took the matter under submission. At the first such oral hearing, the trial court had stated the March 7, 1988, letter constituted a solicitation, but the trial court's written order concluded Sacks had a right to solicit the clients of her former employer with which she personally had become acquainted during the course of her employment.

The trial court also found the evidence did not support ACI's allegation of misappropriation of trade secrets. To the extent ACI's unfair competition claim had merit, the trial court held money damages provided an adequate remedy.

### CONTENTIONS

ACI contends its customers list, policy expiration dates and related information constitute trade secrets. ACI asserts Sacks used these trade secrets to negotiate with F&D and to divert ACI business to F&D. Also, ACI claims the trial court ignored undisputed evidence which established Sacks wrongfully had solicited ACI clients, erred in finding money damages an adequate remedy, and improperly failed to enjoin Sacks from further solicitation of ACI clients.

### DISCUSSION

1. *Abuse of discretion standard governs review of grant or denial of preliminary injunction.*

■ "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.] . . . [¶] A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.] Further, the burden rests with the party challenging

the injunction to make a clear showing of an abuse of discretion. [Citations.] [¶] This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will *prevail on the merits at trial*. The second is the *interim harm* that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.] . . . ' "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or . . . should not be restrained from exercising the right claimed . . . ." ' [Citation.]" (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121], italics added.)

We review this record with these principles in mind.

2. *The ACI customer list constitutes a trade secret.*

    a. *UTSA.*

The Legislature enacted the UTSA in 1984 and it became effective on January 1, 1985. In the event of a conflict between prior case law and the statute, the UTSA controls. (*American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318, 1324 [228 Cal.Rptr. 713].)

The stated purpose of the UTSA is to provide "unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations for the various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law. The Uniform Act also codifies the results of the better reasoned cases concerning the remedies for trade secret misappropriation." (Comrs. Prefatory Note to Uniform Trade Secrets Act, 14 West's U. Laws Ann. (1980) Trade Secrets 537, 538.)

The UTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

    b. *Application here.*

■ If the two-prong UTSA test is applied to the present situation, it must be concluded the ACI customer list is "information" which has

potential economic value because it allows a competitor to direct sales efforts to the elite 6.5 percent of those potential customers which already have evinced a predisposition to purchase credit insurance.

Although a large number of firms could purchase credit insurance to protect their accounts receivable, most do not. Sacks admitted in her deposition a prospective client first had to be sold on the concept of credit insurance before an agent could attempt to sell a policy, and that 65 to 75 percent of policyholders renew.

Further, ACI took reasonable steps to insure the secrecy of this information as required by the UTSA. Sacks stipulated in the Wixom action that certain confidential information consisting of the subpoenaed log books with leads from August 1983 forward would be subject to a protective order. Also, ACI required its employees to sign confidentiality agreements respecting its client list, expiration date of policies, lists of business leads, claims histories, and related client information.[6] Thus, under the UTSA, the ACI customer list constitutes a trade secret.

   c.   *Identical result under pre-UTSA case law.*

California courts protected retail delivery routes of customers as against a former employee for many years before enactment of the UTSA. (E.g., *Empire Steam Laundry* v. *Lozier* (1913) 165 Cal. 95 [130 P. 1180] [laundry route]; *Cornish* v. *Dickey* (1916) 172 Cal. 120 [155 P. 629] [bakery route]; *New Method Laundry Co.* v. *MacCann* (1916) 174 Cal. 26 [161 P. 990] [laundry route].)

This protection expanded to include customer lists of other types of businesses. (E.g., *Scavengers P. Assn.* v. *Serv-U-Garbage Co.* (1933) 218 Cal. 568 [24 P.2d 489] [the salvage business]; *Cal. Intelligence Bureau* v. *Cunningham* (1948) 83 Cal.App.2d 197 [188 P.2d 303] [the unique service of investigating charities to protect subscribers from fraudulent or unworthy solicitation]; *Klamath-Orleans Lumber, Inc.* v. *Miller* (1978) 87 Cal.App.3d 45 [151 Cal.Rptr. 1188 [the manufacture of load binders].)

In *State Farm Mut. etc. Ins. Co.* v. *Dempster* (1959) 174 Cal.App.2d 418 [344 P.2d 821], customer information nearly identical to that found here received protection. There, an insurance company sought to enjoin its former agents from interfering with policyholders the agents had serviced. The former agents had contacted policyholders at automobile insurance renewal time and had advised them not to renew with State Farm.

---

[6] Sacks's assertion she never signed such an agreement does not alter our analysis.

State Farm asserted trade secret status as to various information including " 'the names, addresses and telephone numbers of policyholders, the amounts and types of insurance . . . , due dates of premiums and amounts thereof, . . . , and particularly the renewal and expiration dates of policies in force.' " (*State Farm Mut. etc. Ins. Co.* v. *Dempster, supra,* 174 Cal.App.2d at p. 422.)

The *State Farm* court found "the very recital of the nature of the information acquired by the salesman and the unique interest of the company in the information, places it in the category of the trade secret . . . ." (*State Farm Mut. etc. Ins. Co., supra,* 174 Cal.App.2d at p. 426.)

We perceive no substantial difference between the information at issue in *State Farm* and this case. In fact, the list of ACI policyholders constitutes a more elite compilation than the automobile policyholders involved in *State Farm* and therefore is more deserving of protection.

Under either the UTSA or at common law, the ACI customer list is a trade secret.

3. *Sacks's conduct constituted misappropriation of ACI's trade secrets.*

■ Sacks contends her conduct merely invited business inquiry by announcing a new business affiliation and that this activity is not prohibited by the UTSA definition of misappropriation because such conduct falls within the common law right to compete fairly.

The UTSA defines misappropriation as: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [¶] (2) *Disclosure or use of a trade secret of another without express or implied consent by a person who*: [¶] (A) Used improper means to acquire knowledge of the trade secret; or [¶] (B) *At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was*: [¶] (i) Derived from or through a person who had utilized improper means to acquire it; [¶] (ii) *Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;* or [¶] (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . . ." (Civ. Code, § 3426.1, subd. (b), italics added.)

The portion of the definition which applies here is highlighted and proscribes "disclosure or use" of a trade secret, without express or implied consent, by a person who acquired knowledge of the trade secret under

circumstances giving rise to a duty to maintain its secrecy or limit its use. Clearly, in the broadest construction of this definition, Sacks's letter to ACI policyholders constituted a "use" of the ACI customer list.

Restated in the terms of the UTSA definition of misappropriation, Sacks contends the UTSA cannot so limit the use of the ACI customer list as to usurp her right to announce a new business affiliation. We conclude the common law right to compete fairly and the right to announce a new business affiliation have survived enactment of the UTSA. However, Sacks's March 7 letter went beyond an appropriate professional announcement and constituted a solicitation of the ACI customer list.

4. *The common law property right to compete fairly is unavailing to Sacks.*

■ "Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. [¶] *Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted.*" (*Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9], italics added, citing *New Method Laundry Co.* v. *MacCann, supra,* 174 Cal. 26.)

a. *Free competition prevails in the absence of a trade secret customer list.*

A seminal and frequently quoted case in this area is *Avocado Sales Co.* v. *Wyse* (1932) 122 Cal.App. 627[10 P.2d 485]. There, an avocado salesman could not be enjoined from "canvassing and soliciting" (*id.,* at p. 628) the fruit stands, markets, cafes and hotels he had called upon on behalf of his former employer because a list of *retail avocado sellers could not be viewed as confidential.* The court asked: "Could not any [avocado] salesman see at a glance where to attempt to sell his wares?" (*Id.,* at p. 634.) That is, in the absence of any secret, there could be no trade secret.

Similarly, our Supreme Court has declined to protect the customers of a floor wax manufacturer or a janitorial service because "the names and addresses of persons, firms and corporations using the type of products sold

by plaintiff are *commonly known to the trade,* and that they are called upon by salesmen for various companies." (*Continental Car-Na-Var Corp.* v. *Moseley, supra,* 24 Cal.2d at pp. 108-109, italics added; *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198 [246 P.2d 11].)

Obviously, in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect clients against competition from former employees. Also, even when a trade secret customer list exists, the common law cases acknowledged a right to announce a new affiliation as contrasted with a solicitation for patronage.

    b.  ■■  *Sacks's duty under the UTSA to limit use of the ACI trade secret customer list did not preclude a professional announcement of a new affiliation.*

At common law, the boundary separating fair and unfair competition in the context of a protected customer list has been drawn at the distinction between an announcement and a solicitation.  ■■  In the course of its discussion in *Aetna Bldg. Maintenance Co.* v. *West, supra,* 39 Cal.2d at pages 203-204, our Supreme Court noted the difference and stated the verb " '[s]olicit' is defined as: 'To ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' [Citation.] 'It implies *personal* petition and importunity addressed to a particular individual to do some particular thing, . . .' [Citation.] It means: 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore or importune; to make petition to; to plead for; to try to obtain.' [Citation.]"

However, the *Aetna* court observed that "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. [Citations.]" (*Aetna Bldg. Maintenance Co.* v. *West, supra,* 39 Cal.2d at p. 204.)

Although *Aetna* involved the customer list of a janitorial service which did not constitute a trade secret, the same rule has been applied where a trade secret list exists.

Illustrative of this principle is the case of *Theodore* v. *Williams* (1919) 44 Cal.App. 34 [185 P. 1014]. There, a laundry route driver, Adkins, left the

employ of Anaheim Laundry and began to work in the area of his former route for another company. After Adkins apparently had solicited improperly along the route, Anaheim Laundry sought and obtained an injunction permanently barring such solicitation by Adkins.

When customers along the route refused to continue business with Adkins's replacement, Anaheim Laundry sought to cite Adkins for contempt for violation of the injunction. However, the evidence showed Adkins had done no more than drive along the route in a newly labeled truck, place an advertisement in a newspaper announcing his new affiliation, and pick up laundry only "where he had been previously requested personally by note or by telephone to call and get their work." (*Theodore* v. *Williams, supra,* 44 Cal.App. at p. 39.) The court held such activity did not constitute solicitation.

Thus, even though the laundry route customer list deserved protection from *solicitation* by Adkins, the former employer could not prevent Adkins's *announcement* of new affiliation and subsequent receipt of trade on the route.

The most recent case to deal with the announcement rule is *Moss, Adams & Co.* v. *Shilling* (1986) 179 Cal.App.3d 124 [224 Cal.Rptr. 456], upon which the trial court relied in finding Sacks properly could solicit the ACI policyholders she personally had serviced.

*Moss, Adams,* involved departing employees of an accounting firm who announced the formation of a new accounting partnership to those clients the former employees had serviced on behalf of the firm. The trial court granted summary judgment in favor of the employees based upon the *Aetna* rule that " '[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation.' [Citations.]" (*Moss, Adams & Co., supra,* 179 Cal.App.3d at p. 127.)

The announcement to the former employer's clients in *Moss, Adams* stated: " 'John D. Shilling and Cynthia L. Kenyon, formerly with Moss Adams, are pleased to announce the formation of a new partnership: Shilling, Kenyon & Co.[,] Certified Public Accountants[,] Lloyds Bank Building[,] One Almaden Blvd., Suite 1110[,] San Jose, CA 95113[,] (408) 295-3822[.]' " (*Moss, Adams & Co.* v. *Shilling, supra,* 179 Cal.App.3d at p. 127.)

The *Moss, Adams* court affirmed the trial court and cited the frequently quoted maxim that employees cannot "be compelled to 'wipe clean the slate of their memories.' " (*Moss, Adams & Co., supra,* 179 Cal.App.3d at p. 129.) The *Moss, Adams'* court concluded: "(1) former employees cannot use trade

secrets to announce a change of employment to the former employer's customers, (2) the names of clients to whom [the ex-employees] mailed announcements were known to them from personally providing accounting services and therefore were not trade secrets, . . ." (*Moss, Adams & Co., supra,* 179 Cal.App.3d at p. 130.)

However, before the effective date of the UTSA, the announcement rule permitted former employees to *announce* a change of employment, even to individuals or firms on a protected trade secret customer list.[7] (*Theodore* v. *Williams, supra,* 44 Cal.App. 34.)

Moreover, the fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue. Providing personal service to a customer whose identity is a trade secret does not thereafter render that customer fair game for solicitation. In fact, it is against those very employees who personally service customers that employers are most in need of protection. Thus, the trial court's reliance on *Moss, Adams* was misplaced.

■ Notwithstanding the foregoing, we believe the *Moss, Adams* result, as opposed to the statement of its conclusion, is correct and survives the enactment of the UTSA. That is, the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition. Therefore, the acquisition of trade secrets under circumstances giving rise to a duty to limit their use, as is the case here, clearly allows for such an announcement. To hold otherwise unnecessarily would contravene widely accepted and well-established business practices.

c. *Sacks's March 7, 1988, letter went beyond an announcement and amounted to a solicitation.*

■ Sacks claims the March 7 letter merely announced a change of employment. Although the letter begins as an announcement of her departure from ACI and affiliation with F&D, it soon assumes a different tone. Sacks informs ACI's customers of the interesting competitive alternative F&D offers as compared to ACI's policies. She invites their inquiry about the F&D policy and indicates she would be happy to discuss it in detail when they are ready to renew. She personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies F&D can provide and for assistance during the agent transition period.

---

[7]Although the *Moss, Adams* decision postdates enactment of the UTSA, the conduct involved therein occurred before its effective date of January 1, 1985. (Civ. Code, § 3426.10.)

Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business. Sacks, in a word, solicited. Therefore, as a matter of law, Sacks's letter of March 7, 1988, constituted a solicitation.

5. *Money damages inadequate.*

■ Determination of the solicitation issue in favor of ACI does not necessitate the further conclusion the trial court should have issued the preliminary injunction, especially after Sacks already had mailed the letter. However, we conclude Sacks's conduct, considered in the aggregate, merited such judicial intervention.

The UTSA provides that "actual or threatened misappropriation may be enjoined." (Civ. Code, § 3426.2, subd. (a).) "The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause." (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 73.)

Here, in addition to soliciting the ACI customers by letter, Sacks also telephoned each client to follow up on the letter and told clients of her possible departure when she met with them for renewal of their policies. She also mistakenly believed the sales leads she had developed while affiliated with ACI belonged to her.

Finally, and perhaps most importantly, she had provided information about, and acted as an intermediary for, F&D on behalf of a highly lucrative ACI client which constituted nearly 30 percent of her annual premiums.

The client's declarations to the contrary notwithstanding, Sacks essentially conceded she already had referred the client to an F&D agent and earned a commission on issuance of the F&D policy. Sacks admitted her conduct with respect to this client had been different than it had been in the past when a policyholder expressed an interest in a competitor.

Given the aggressive manner in which Sacks chose to terminate her employment, ACI likely will sustain continuing interim harm in the absence of an injunction. Further, based on our ruling that ACI's customer list is a trade secret, and that Sacks's letter amounted to a solicitation, ACI is likely to prevail on the merits at trial.

Therefore, the matter is remanded to the trial court to enable it to form injunctive relief consistent with the views expressed herein.

## CONCLUSION

We conclude ACI's customer list and related information falls within the UTSA definition of trade secrets because of the unique nature of the insurance and the product resistance which must be overcome before this type of insurance can be sold or renewed. Also, ACI undertook reasonable efforts to maintain their secrecy. Solicitation of those customers by Sacks constitutes a misappropriation of ACI's trade secret within the meaning of the UTSA. In light of Sacks's conduct, the trial court should have enjoined further unfair competition.

## DISPOSITION

The judgment is reversed and the matter remanded to the superior court for reconsideration in accordance with the principles stated. Sacks to bear costs on appeal.

Danielson, J., and Croskey, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 16, 1989.