[No. D054207. Fourth Dist., Div. One. July 30, 2009.]

THE RETIREMENT GROUP, Plaintiff and Respondent, v.
JAMES GALANTE et al., Defendants and Appellants.

1228

**COUNSEL**

Law Offices of David H. Schwartz, David H. Schwartz, Gregory J. Wood; Marks, Golia & Finch, Davide Golia and Jeffrey B. Baird for Defendants and Appellants.

Duckor Spradling Metzger & Wynne, Scott L. Metzger and Kevin L. Wheeler for Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—The Retirement Group[1] (TRG) filed this action alleging numerous individually named defendants,[2] formerly affiliated with TRG, had established a business in competition with TRG. The complaint alleged that Advisers had misappropriated TRG's trade secrets, which Advisers were using to solicit TRG's existing customers to change their patronage to Advisers' competing business. TRG sought and obtained a preliminary injunction that enjoined numerous categories of conduct by Advisers. This appeal challenges the preliminary injunction only insofar as it barred Advisers from "[d]irectly or indirectly soliciting any [current] TRG [customers] . . . to transfer any securities account or relationship from TRG to [Advisers] or any broker-dealer or registered investment advisor other than TRG."

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties*

In the early 1990's, Jastremski and Frank Cuenca formed an association and began doing business under the name "The Retirement Group." They

[1] The lawsuit, filed by John Jastremski on behalf of TRG, alleges that Jastremski is currently the general partner of TRG.

[2] The individual appellants in this proceeding are defendants Michael Lambrix, Tim Sullivan, Jeremy Laub, and Shawn McElderry. For ease of reference, we refer to these defendants collectively as Advisers to reflect their role as investment advisers to the customers for whom they provided services.

operated that association on an informal basis until approximately 2006. However, when Jastremski regained some of his securities licenses, he formally assumed a "partnership" interest in TRG.[3]

TRG's business had two components: a broker/dealer component and a registered investment adviser (RIA) component. Some of TRG's customers "entered into a direct securities account relationship" with a securities broker/dealer, which cleared the securities transactions for the customer and held the account for the customer. During the relevant period, Securities Services Network, Inc. (SSN), was the broker/dealer that provided those services to TRG customers. TRG had independent contractor relationships with various registered representatives (including some of the defendant Advisers here) licensed by the Securities and Exchange Commission (SEC) to sell securities and provide investment advice to customers, and these registered representatives (RR) also entered into independent contractor relationships with SSN.

The RIA component of TRG's business, as described by Jastremski, involved RR's acting "under" an RIA to provide investment advice to customers on a fee-for-service basis. The customer entered into an independent investment adviser agreement with the RR, which granted the RR under the RIA limited discretion regarding the account, and that "custodied" the customer's securities with broker/dealers.

TRG spent substantial resources to develop its customer base through seminars and other marketing efforts, and approximately 95 percent of TRG's customers were obtained from these marketing efforts. TRG conducted seminars throughout the country to generate leads, had its agents pursue leads through telephonic contacts with prospective customers, and had its agents spend many hours in telephonic contact with customers and brokers. By the time Advisers terminated their relationship with TRG, a database maintained by TRG contained the names of customers and potential customers (as well as contact information for these persons) essential to maintaining TRG's business, and TRG took precautions to maintain the confidentiality of its database.[4] One of those precautions was that no person was allowed to access the secure database unless and until that person had signed an agreement

---

[3] There is substantial dispute over whether TRG was a partnership. Cuenca's evidence alleged TRG was a sole proprietorship with Cuenca as sole proprietor.

[4] The precise content of the database, apart from the names and contact information for existing customers and potential customers, is unclear. Although TRG's brief on appeal represented that the database contained extensive additional information (e.g., notations memorializing the date of contacts with potential or existing customers, the method of contact, the substance of the conversation, plans for future contacts, financial information on the customer or prospective customer as well as retirement goals and planned retirement date), TRG's brief has not directed this court to evidentiary support for these assertions. (Cf. *Morris v.*

requiring him or her to maintain the confidentiality of information in the database.[5] Additionally, TRG's secure database was configured to preclude electronic copying of any information in that database.

## B. *The Dissolution*

During the summer of 2008, Cuenca told Jastremski that he was terminating his relationship with Jastremski and was joining a different company (defendant Monarch Retirement & Investments (Monarch)) that would be competing with TRG. Monarch had been formed by several individuals (defendants Lambrix, Sullivan, Laub and McElderry) who had been independent contractors for TRG. Shortly after Cuenca joined Monarch, defendant Galante (who had also been an independent contractor for TRG) also terminated his relationship with TRG and thereafter joined Monarch.

Advisers contacted many of their customers to inform them that Advisers were switching to a new RIA, as well as to a new broker/dealer, and provided the customer with a form if the customer wanted to follow them and designate SII Investments, Inc. (SII), as the broker/dealer, and that Advisers would be their RR's at SII and their designated independent advisers. For many of the customers contacted, Advisers obtained the names and contact information from databases owned and maintained by independent third parties, including SSN. At least one Adviser had many of his customers' names and contact information on a personal list he maintained.[6]

## C. *The Lawsuit*

TRG filed this action that (as amended) alleged numerous claims. Insofar as relevant to this proceeding, however, TRG alleged Advisers had misappro-

---

*De La Torre* (2005) 36 Cal.4th 260, 265, fn. 2 [30 Cal.Rptr.3d 173, 113 P.3d 1182] [factual assertions unsupported by citations to the record will be ignored].)

[5] Advisers, with whom TRG had entered into independent contractor relationships, had signed a written "Marketing and License Agreement" (MLA) that contained numerous clauses, including clauses that defined TRG's confidential information (MLA, par. 1.3) and covenanted that (both during the term of the relationship and thereafter) Advisers would keep the information confidential and would not "disclose or use" the information except as provided by the MLA.

[6] Galante's declaration stated he had a handwritten list of his personal customers, which he kept because he "contact[ed] them on a regular basis." Galante also averred that he "wanted to check that I had not missed anyone and wrote down some names and contact information from [TRG's] database," but averred that information was duplicative of the information "already available through SSN or other custodial institutions holding the [customer] accounts and to which I had access."

priated the confidential information contained on TRG's secure database, the confidential information constituted trade secrets of TRG, and Advisers were using the confidential information to solicit existing customers of TRG to leave TRG and transfer their accounts to Advisers, as well as to solicit prospective customers.

TRG sought and obtained a preliminary injunction precluding Advisers from engaging in numerous categories of conduct. The fourth category of enjoined conduct (Category 4), and the only aspect of the preliminary injunction challenged in the present proceeding, included a prohibition against Advisers from "[d]irectly or indirectly soliciting any [current] TRG [customers] . . . to transfer any securities account or relationship from TRG to [Advisers] or any broker-dealer or registered investment advisor other than TRG." A separate category of the injunction (Category 3) provided Advisers were enjoined from "[u]sing in any manner TRG information found solely and exclusively on TRG databases. [However,] [s]imilar information found on servers, databases and other resources owned and operated by other entities or businesses is excluded from the injunction . . . ."

TRG subsequently filed an application for an order to show cause regarding contempt, asserting Advisers had violated the terms of the injunction by, among other things, "continu[ing] to contact [TRG customers] in an effort to solicit their business . . . even after three ex parte hearings to stop this conduct and despite TRG's counsel's numerous letters advising [Advisers] that this conduct would not be tolerated." Advisers opposed the application, and cross-petitioned for an order clarifying or modifying the injunction. Advisers' cross-petition asserted the conduct enjoined by Category 4 did not define the term "solicit," Advisers were left to guess at what conduct might violate the injunction under the recurring circumstances then confronting Advisers,[7] and therefore Advisers moved to modify Category 4 to clarify what conduct was proscribed. The court declined to modify the injunction.

---

[7] Advisers averred that after the preliminary injunction was issued, Jastremski and others at TRG acting as RR's of SSN had their registrations terminated and were no longer registered with any broker/dealer. Accordingly, SSN sent letters to a limited group of customers (e.g., those who had not signed documents to follow Advisers to Monarch) stating these customers no longer had RR's for their customer accounts, and advising the customers to find a new brokerage firm. Advisers averred that these customers began contacting Advisers to inquire about transferring to SII to have Advisers become their RR's/RIA's again, but Advisers were uncertain whether the terms of the injunction barring "soliciting" would permit Advisers to substantively respond to these inquiries. Accordingly, Advisers sought clarification of what conduct would be permissible under the terms of the injunction.

Advisers timely appealed the order granting TRG's motion for preliminary injunction.[8] Advisers challenge only the injunctive relief granted by Category 4, asserting the relief granted violates *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937 [81 Cal.Rptr.3d 282, 189 P.3d 285] (*Edwards*) and is beyond the relief otherwise authorized under California law.[9]

## II

## ANALYSIS

### A. *Legal Framework*

Advisers assert the court's injunction against "[d]irectly or indirectly soliciting any [current] TRG [customers] . . . to transfer any securities account or relationship from TRG to [Advisers] or any broker dealer or registered investment advisor other than TRG" is invalid. To determine this issue, we are required to examine and resolve the tension between two competing strands of legal principles in California. The first strand, on which Advisers rely, provides that California courts refuse to enforce most "noncompetition" agreements as violative of a strong public policy, embodied in Business and Professions Code section 16600 (section 16600), favoring free competition. The competing strand, on which TRG relies, provides that California courts will protect an employer from the misappropriation of its trade secrets by anyone, including its former employees. We examine each in turn.

### *Section 16600*

■ "[A]t common law and in many states, a restraint on the practice of a trade or occupation, even as applied to a former employee, is valid if reasonable . . . ." (*Bosley Medical Group v. Abramson* (1984) 161 Cal.App.3d 284, 288 [207 Cal.Rptr. 477].) However, California long ago rejected the so-called "rule of reasonableness" when it enacted Civil Code former sections 1673 through 1675, the predecessor sections to Business and Professions Code sections 16600 through 16602. "At least since 1872, a noncompetition agreement has been void unless specifically authorized by sections 16601 or 16602." (*Bosley*, at p. 288.) These legislative enactments "settled public

---

[8] Advisers also petitioned for a writ of supersedeas seeking (among other things) a stay of enforcement of the ban on Category 4 conduct and of the pending contempt proceeding pending the outcome of the present appeal. On May 19, 2009, this court issued an order staying the contempt proceeding.

[9] Advisers also challenge the provisions of Category 4 as an invalid prior restraint on their First Amendment rights of speech and association, and on the ground that the enjoined conduct is couched in terms too vague to give fair notice of the conduct proscribed by the injunction. Because of our conclusions, it is unnecessary to address these separate alleged deficiencies.

policy in favor of open competition, and rejected the common law 'rule of reasonableness,' [and] [t]oday in California, covenants not to compete are void, subject to several exceptions . . . ." (*Edwards, supra*, 44 Cal.4th at p. 945.)

Because *Edwards* appears pivotal to resolution of this appeal, we examine it in detail. There, the employee (Edwards) signed a nonsolicitation agreement, substantively indistinguishable from the nonsolicitation agreement in this case, as a condition to his employment with Andersen. When Andersen was forced to sell Edwards's practice group to a third party, the third party (HSBC) agreed to hire Edwards but required (as a condition of hiring) that Edwards obtain a "Termination of Non-compete Agreement" (TONC) to obtain employment with HSBC. The TONC required, among other things, that Edwards voluntarily resign from and release Andersen from any and all claims against Andersen. In exchange, Andersen would agree to release Edwards from the noncompetition agreement; however, Andersen would not release Edwards from the noncompetition agreement unless he signed the TONC. Edwards signed HSBC's offer letter but refused to sign the TONC; in response, Andersen terminated Edwards's employment and refused to release him from the noncompetition agreement, and HSBC therefore withdrew its offer of employment to Edwards. (*Edwards, supra*, 44 Cal.4th at pp. 942–943.)

Edwards's complaint against Andersen alleged a claim for intentional interference with prospective economic advantage. The *Edwards* court noted an essential element of the claim was a showing there was an intentional act by the defendant designed to disrupt the relationship that was "wrongful, independent of its interfering character. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393 [45 Cal.Rptr.2d 436, 902 P.2d 740].) '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' [Quoting *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 [131 Cal.Rptr.2d 29, 63 P.3d 937].]" (*Edwards, supra*, 44 Cal.4th at p. 944.) The trial court ruled against Edwards on this claim, concluding the noncompetition agreement did not violate section 16600 because it was narrowly tailored and did not deprive Edwards of his right to pursue his profession, and therefore Andersen's conduct in requiring Edwards to sign the noncompetition agreement and TONC was not an unlawful act. (44 Cal.4th at p. 944.) In the Court of Appeal, Edwards argued the "independently wrongful act" requirement was met because, in part, the noncompetition agreement was illegal under section 16600, which rendered Andersen's demand that he give consideration to be released from it against public policy. The Court of Appeal agreed, holding section 16600 invalidated the noncompetition agreement and therefore purporting to require Edwards to sign the TONC as consideration to be released

from the noncompetition agreement was an independently wrongful act for purposes of Edwards's intentional interference with prospective economic advantage claim. (*Edwards*, at pp. 944–945.)

The *Edwards* court, affirming the Court of Appeal's analysis of the invalidity of the noncompetition agreement, noted section 16600 "protects 'the important legal right of persons to engage in businesses and occupations of their choosing' " (*Edwards, supra,* 44 Cal.4th at p. 946, quoting *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1520 [66 Cal.Rptr.2d 731]), and under section 16600's plain meaning "an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions" to section 16600. (*Edwards*, at pp. 946–947.) Importantly, the *Edwards* court rejected Andersen's argument that the term "restrain" under section 16600 should be construed as meaning "simply to 'prohibit,' so that only contracts that totally prohibit an employee from engaging in his or her profession, trade, or business are illegal[, and therefore] a mere limitation on an employee's ability to practice his or her vocation would be permissible under section 16600, as long as it is reasonably based." (*Edwards*, at p. 947.) *Edwards* also rejected Andersen's assertion that California decisional authority has embraced the rule of reasonableness in evaluating competitive restraints, the predicate to Andersen's claim that " 'only broad agreements that prevent a person from engaging entirely in his chosen business, trade or profession [violate section 16600 and] [a]greements that do not have this broad effect—but merely regulate some aspect of post-employment conduct, e.g., to prevent raiding [employer's personnel]—are not within the scope of [s]ection 16600.' " (*Id.* at p. 947.) Instead, concluded *Edwards*, the decisional law on which Andersen relied involved noncompetition clauses in situations in which express statutory exceptions to section 16600 were applicable. (*Edwards*, at pp. 947–948.)

*Edwards* also rejected Andersen's argument that California should superimpose a nonstatutory exception to section 16600 by adopting the limited or "narrow-restraint" exception discussed by the Ninth Circuit in *Campbell v. Board of Trustees of Leland Stanford Junior University* (9th Cir. 1987) 817 F.2d 499, which the trial court in *Edwards* relied on to uphold the noncompetition agreement. *Edwards* noted the *Campbell* court, despite acknowledging California had rejected the common law "rule of reasonableness" with respect to restraints on the ability to pursue a profession, nevertheless concluded section 16600 " 'only makes illegal those restraints which preclude one from engaging in a lawful profession, trade, or business' " and remanded the case to the district court to allow the employee to prove the noncompetition agreement at issue completely restrained him from practicing his profession within the meaning of section 16600. (*Edwards, supra,* 44 Cal.4th at p. 948; see *Campbell*, at pp. 502–503.) *Edwards* declined to adopt

*Campbell's* approach because *Campbell*, in concluding California courts have excepted from section 16600 agreements that bar one from pursuing only a small or limited part of the profession (*Campbell*, at p. 502), appeared to have confused the import of *Boughton v. Socony Mobil Oil Co.* (1964) 231 Cal.App.2d 188 [41 Cal.Rptr. 714] and *King v. Gerold* (1952) 109 Cal.App.2d 316 [240 P.2d 710], and Andersen's reliance on those cases for carving out an exception to section 16600 was similarly misplaced. *Edwards* noted *Boughton* did not involve a restriction on the employee's practice of a profession or trade, but took the form of a covenant in a deed to a parcel of land that specified the land could not be used as a gasoline service station for a specified time period. (*Edwards*, at p. 949; *Boughton*, at p. 188.) *Edwards* also noted *Boughton* relied on *King*, which involved a claim of unfair competition. (*Edwards*, at p. 949; *King, supra*, 109 Cal.App.2d 316.) Because *King* did not merely involve an injunction against a former employee's manufacture and sale of goods (house trailers), but instead involved an injunction involving the former employee's alleged use of a trailer design substantially similar to his former employer's (the inventor of the design), *Edwards* concluded *King* was not authority for the proposition that noncompetition clauses imposing a limited or narrow restraint were excepted from section 16600. (*Edwards*, at pp. 948–949.)

■  *Edwards* recognized other federal cases had followed *Campbell's* narrow-restraint exception to section 16600, but concluded California courts have neither embraced the Ninth Circuit's narrow-restraint exception nor endorsed its reasoning, and concluded: "[W]e are of the view that California courts 'have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat.' (*Scott v. Snelling and Snelling, Inc.* (N.D.Cal. 1990) 732 F.Supp. 1034, 1042.) Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect. We reject Andersen's contention that we should adopt a narrow-restraint exception to section 16600 and leave it to the Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint rule under section 16600." (*Edwards, supra*, 44 Cal.4th at pp. 949–950, fn. omitted.)

Although *Edwards* reaffirmed the broad California rule that invalidates noncompetition agreements falling outside of statutorily prescribed exceptions, *Edwards* expressly stated it was not "address[ing] the applicability of the so-called trade secret exception to section 16600." (*Edwards, supra*, 44 Cal.4th at p. 946, fn. 4.)

*Trade Secrets*

■ An equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer. The court in *Morlife, Inc. v. Perry, supra,* 56 Cal.App.4th at pages 1519 to 1520, articulating the competing considerations, stated: "While it has been legally recognized that a former employee may use general knowledge, skill, and experience acquired in his or her former employment in competition with a former employer, the former employee may not use confidential information or trade secrets in doing so. [¶] Our Supreme Court recognized the delicate balance between promoting unfettered competition and protecting business from unfair conduct in *Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104 [148 P.2d 9]: 'Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. . . . A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. [Citation.]' (*Id.* at p. 110.) [¶] To be sure, we acknowledge the important legal right of persons to engage in businesses and occupations of their choosing. . . . Yet also fundamental to the preservation of our free market economic system is the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation protected from the gratuitous use of that 'sweat-of-the-brow' by others."

■ In accordance with these principles, the courts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information* to solicit those customers. (See *American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 634 [262 Cal.Rptr. 92] ["in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect [customers] against competition from former employees"]; accord, *Aetna Bldg. Maintenance Co. v. West* (1952) 39 Cal.2d 198, 204–206 [246 P.2d 11].) Thus, it is not the *solicitation* of the former employer's customers, but is instead the *misuse of trade secret information*, that may be enjoined. (Cf. *Southern Cal. Disinfecting Co. v. Lomkin* (1960) 183 Cal.App.2d 431, 442–448 [7 Cal.Rptr. 43]; accord, *Hollingsworth Solderless Terminal Co. v. Turley* (9th Cir. 1980) 622 F.2d 1324, 1338 ["We think the applicable California law is that 'the employer will be able to restrain by

contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract.' "].)

Numerous courts have concluded customer lists can qualify for trade secret protection. (See *Gordon v. Landau* (1958) 49 Cal.2d 690 [321 P.2d 456]; *Gordon v. Schwartz* (1956) 147 Cal.App.2d 213 [305 P.2d 117]; *Gordon v. Wasserman* (1957) 153 Cal.App.2d 328 [314 P.2d 759].) Although "courts are reluctant to protect customer lists to the extent they embody information . . . 'readily ascertainable' through public sources, such as business directories . . . where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers." (*Morlife, Inc. v. Perry, supra*, 56 Cal.App.4th at pp. 1521–1522, citation omitted.)

### B.  *Evaluation*

◼    We distill from the foregoing cases that section 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business, but a court may enjoin *tortious* conduct (as violative of either the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) and/or the unfair competition law) by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer. Viewed in this light, therefore, the conduct is enjoinable *not* because it falls within a judicially created "exception" to section 16600's ban on contractual nonsolicitation clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking.

◼    Application of these principles here convinces us the injunctive provisions of Category 4 on their face violate *Edwards* and, when viewed in counterpoise with the injunctive provisions of Category 3, cannot rationally be upheld as an injunction limited in scope to the only legitimate protection (i.e., enjoining the misappropriation of TRG's trade secrets) for which injunctive relief may be issued. First, the injunctive provisions of Category 4 purport to bar Advisers from engaging in conduct substantively indistinguishable from the contractually proscribed conduct that, concluded *Edwards*, was

violative of the protections of section 16600.[10] Accordingly, the facial language contained in Category 4 transgresses section 16600 under *Edwards*.

Additionally, we are convinced Category 4 cannot be upheld as an injunction designed to have the limited effect of protecting against the misappropriation of TRG's trade secrets, because the injunctive provisions of Category 3 already grant the full range of trade secret protections to which TRG is entitled. Category 3 of the injunction, which Advisers do not challenge, barred Advisers from "[u]sing in any manner TRG information *found solely and exclusively* [*in*] *TRG databases*" (italics added) but expressly excluded from its ambit the use of "[s]imilar information found on servers, databases and other resources owned and operated by other entities or businesses." Thus, absent the provisions of Category 4, Advisers could compete with TRG for the business of TRG's existing customers by employing all available resources and information *except* for those materials (because they are found "solely and exclusively on TRG's databases") constituting protectable trade secrets. Accordingly, Category 4 adds nothing to further the legitimate scope of protections (e.g., protection of TRG's trade secrets) to which TRG is entitled, and can only operate to preclude the precise type of competition *Edwards* declares is otherwise permissible.

TRG raises several arguments to support its assertion that Category 4 is both a valid protection of its trade secret information and a proper adjunct to the distinct provisions of Category 3. First, TRG asserts the conduct enjoined by Category 4 is outside the boundaries of *Edwards* because *Edwards* expressly excepted from its ruling noncompetition clauses falling within the trade secret exception to section 16600. However, *Edwards* did not *approve* the enforcement of noncompetition clauses whenever the employer showed the employee had access to information purporting to be trade secrets. Instead, *Edwards* merely stated it was not required to "address the applicability of the so-called trade secret exception to section 16600" (*Edwards, supra,* 44 Cal.4th at p. 946, fn. 4) because it was not germane to the claims raised by the employee.

TRG next asserts that numerous cases have ruled former employees may not solicit customers of the former employer, and an injunction may be issued to prevent such solicitation. However, we have already concluded it is not the

---

[10] The injunction here barred Advisers from "[d]irectly or indirectly soliciting any [current] TRG [customers] . . . to transfer any securities account or relationship from TRG to [Advisers] or any broker-dealer or registered investment advisor other than TRG." The contractual clause *Edwards* concluded was unenforceable was a noncompetition clause providing the employee was barred from " 'perform[ing] professional services of the type you provided for any [customer for] which you worked,' " and from " 'solicit[ing] (to perform professional services of the type you provided) any [customer]' " of the employer, for various periods of time. (*Edwards, supra,* 44 Cal.4th at p. 942.)

solicitation of the customers, but is instead the unfair competition or misuse of trade secret information, that may be enjoined. (See, e.g., *Thompson v. Impaxx, Inc.* (2003) 113 Cal.App.4th 1425, 1428–1430 [7 Cal.Rptr.3d 427] [" 'Antisolicitation covenants are void as unlawful business restraints except where their enforcement is necessary to protect trade secrets.' "].) Indeed, although TRG cites numerous cases holding an employee may be enjoined from soliciting persons on his or her employer's trade-secret customer lists, *Thompson*'s rationale for rejecting an analogous argument (which we echo here) explained "respondents argue [that] the cases hold that a covenant which barred the salesmen from soliciting business from customers for one year after termination of employment passed muster under section 16600. However, *respondents leave out the core of the cases' reasoning*: the information about the customers could be protected because it was confidential, proprietary, and/or a trade secret." (*Thompson*, at p. 1429, italics added.)

The bedrock of TRG's argument appears to be that the trial court properly enjoined Advisers from soliciting TRG's customers because the trial court necessarily concluded that the only way Advisers could have known the names and contact information of TRG's customers to enable Advisers to solicit such persons was if Advisers had misappropriated trade secret information found solely and exclusively on TRG's databases. However, TRG did not dispute that its secure database employed security measures sufficient to prevent downloading of its contents, thus undermining the factual basis for this assertion. More importantly, TRG did not dispute that the names of (and contact information for) existing customers were readily available to Advisers from independent third party sources such as Schwab or SSN,[11] thereby obviating TRG's claim that the names and contact information of existing customers constituted protectable trade secret information. (See generally *Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 833–835 [33 Cal.Rptr.3d 901] [a trade secret is information that derives independent economic value from not being generally known to or discernable by the general public or to persons skilled in the trade].) Although TRG peremptorily asserts the names and contact information of customers were protectable trade secrets notwithstanding the availability of that information to Advisers from third party databases, TRG cites no pertinent law supporting that claim.[12]

[11] Indeed, when moving to clarify or modify the injunction, Advisers submitted undisputed evidence that existing customers of TRG were contacting Advisers about moving their accounts in response to a missive sent to the customers by a third party (*not* by Advisers), thus undercutting TRG's claim that Advisers' efforts to solicit TRG's customers *must* have been attributable to trade secret information stolen by Advisers from the TRG database.

[12] The only law cited by TRG to support its claim that the identities of customers remained TRG's trade secrets, despite the presence of their names and contact information on third party databases, is *Morlife, Inc. v. Perry, supra,* 56 Cal.App.4th 1514. However, the court in *Morlife*

TRG also asserts Category 4's injunctive provisions are valid, notwithstanding that Category 3 appears to provide all of the relief permitted by law, because the two categories proscribe different conduct. TRG argues Category 3 prohibits Advisers from using TRG's trade secret database *to pursue potential or prospective customers identified by TRG's marketing efforts*, while Category 4 prohibits Advisers from soliciting existing customers who had not yet transferred their accounts. Although we disagree with TRG's parsing of the injunctive language insofar as its interpretation adds the above italicized language to Category 3, we agree with TRG's construction that Category 3 (barring the use of TRG trade secrets) and Category 4 (barring the solicitation of existing customers) *do* proscribe different conduct. However, we are convinced that construction undermines rather than supports the validity of Category 4. Specifically, because Category 3 already protects against Advisers' use of TRG's trade secrets, we are unable to perceive how Category 4 can have any *additional* operative effect except to bar solicitations *not* involving the use of trade secret information, and the latter type of competition appears to constitute the type of conduct sanctioned by *Edwards*.

TRG also appears to assert the nonsolicitation clauses contained in the Advisers' contracts are enforceable because they are narrowly crafted to prevent the misuse of trade secret information and do not entirely bar Advisers from pursuing their vocation of choice. However, *Edwards* rejected the claim that antisolicitation clauses could be exempt from section 16600 if the conduct covered by such clauses fell within the "narrow-restraint" exception discussed in *Campbell* (*Edwards, supra*, 44 Cal.4th at pp. 948–950), and we decline TRG's implicit invitation to engraft that exception onto this case.

### C. Conclusion

We conclude Category 4 transgresses section 16600 as construed by *Edwards*, and cannot be upheld as an injunction designed for the limited purpose of protecting against the misuse of TRG's trade secrets. Accordingly, the trial court erred by granting the injunctive relief specified in Category 4.

---

evaluated a customer list *only* available to the employer and those employees to whom the employer disclosed the list (*id.* at p. 1521), and *Morlife* expressly noted courts are "reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories." (*Ibid.*) Because *Morlife* did not evaluate whether trade secret lists are protectable when that same list is duplicative of lists available through third party sources, it provides no assistance in the present case.

## DISPOSITION

The trial court shall vacate the preliminary injunction and enter a new and different injunction deleting the language enjoining Advisers from "[d]irectly or indirectly soliciting any [current] TRG [customers] . . . to transfer any securities account or relationship from TRG to defendants or any broker-dealer or registered investment advisor other than TRG." The stay previously issued by this court on May 19, 2009, shall remain in effect until this opinion becomes final and the remittitur has been issued. Defendants are entitled to costs on appeal.

Nares, Acting P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied September 14, 2009, and respondent's petition for review by the Supreme Court was denied November 10, 2009, S176762.