**PYRO SPECTACULARS NORTH, INC. et al., Plaintiffs,**

v.

**Steven SOUZA, Defendant.**

**No. CIV S–12–0299 GGH.**

United States District Court,
E.D. California.

March 21, 2012.

Kurt A. Kappes, Jennifer M. Holly, Greenberg Traurig LLP, Sacramento, CA, for Plaintiffs.

Susan J. Sheridan, Heather R. Messenger, Sheridan Law Corporation and Carroll and Associates PC, Sacramento, CA, for Defendant.

### ORDER

GREGORY G. HOLLOWS, United States Magistrate Judge.

Presently pending before the court is plaintiffs Pyro Spectaculars, Inc.; Pyro Spectaculars North, Inc.; and Pyro Events, Inc.'s ("PSI") motion for a preliminary injunction, which came on for hearing before the undersigned on March 15, 2012. (Dkt. Nos. 34, 35.)[1] Defendant Steven Souza filed an opposition (dkt. no. 47) and PSI filed a reply brief (dkt. no. 72). Both

PSI and defendant also submitted copious declarations, exhibits, and supplemental briefing for the court's review. At the hearing, Kurt Kappes and Jennifer Holly appeared on behalf of PSI and Susan Sheridan and Heather Messenger appeared on behalf of defendant Steven Souza. After considering the papers in support of and in opposition to the motion, the parties' oral argument, and the applicable law, the court now issues the following order preliminarily enjoining defendant Souza and those acting in active concert or participating with him in the misdeeds detailed herein.

### BACKGROUND FACTS[2]

PSI is a business originally started by the Souza family in the early 1900s and is currently one of the largest fireworks production companies in the United States. (Dkt. No. 36 at 2.) Notwithstanding its size, PSI remains a tight-knit, family-operated and managed business. (*Id.*) PSI states that its success in the commercial market is highly dependent on its established relationships with customers, vendors, and pyrotechnic operators. (*Id.*) PSI employs commissioned sales executives to market and sell pyrotechnic displays and services to its customers, which are often ongoing customers that purchase fireworks displays regularly from PSI. (*Id.*)

According to Ian Gilfillan, PSI's Executive Vice President and husband of Nancy Souza, PSI has compiled its list of customers over the decades of its business from advertising, website contacts, publicity, customer referrals, and other sources of leads that have been gathered and for-

---

1. All present parties have consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c), and the case has been referred to the undersigned for all further proceedings and entry of final judgment. (Dkt. Nos. 12, 13, 18.)

2. The court does not exhaustively set forth all the facts and evidence, disputed and undis-

puted, presented by the parties. Instead, the court only outlines some necessary background facts and summarizes evidence that the court finds most persuasive for purposes of adjudicating this motion. Any factual findings in this order are for purposes of the motion for preliminary injunction only and do not constitute ultimate findings of fact in the case.

warded to its account executives to make a sale for PSI. (Dkt. No. 36 at 3.) Customer lists include "the name, address, and phone number of the customer; the 'contact person'; the amount of money previously spent; line item budgets and breakdown of costs of the displays the client purchased; and a breakdown of the specific products used in the individual displays, and a listing of every pyrotechnic operator PSI used for different accounts." (*Id.*) It also includes "customer feedback, complaints and customer preferences, site surveys concerning the size of the fireworks that can be shot in the customer's area, notes about how to improve the customer's shows in the future, as well as special requirements, preferences and procedures of the authorities that have jurisdiction over the displays." (*Id.*) Furthermore, "PSI has compiled lists of pyrotechnic operators, their experience, training, qualifications and requirements, as well as a list of Hazardous Materials Drivers and their experience, training, qualifications and requirements, among other lists that it keeps confidential." (*Id.*) These lists and information were stored in a program on PSI's company database known as the "Booking Form" program. (Dkt. No. 37 at 2; *see also* Dkt. No. 45–6 at 37–38.)

On or about November 1, 1995, PSI hired defendant Steven Souza as an account executive. (Dkt. No. 3–2 at 2.) Defendant was hired both to serve PSI's existing customers and accounts as well as to seek additional accounts. (*Id.*) His responsibilities included the marketing and sales of pyrotechnic displays and show production for Northern California and Hawaii. (*Id.*) Mr. Gilfillan passed this territory on to defendant when he moved up in position with PSI. (Dkt. No. 36 at 2.) PSI expended resources for defendant to visit and develop new and existing PSI clients, and throughout his career at PSI, defendant enjoyed access to PSI's business information, data, and documents. (*Id.*) Indeed,

defendant admitted that he learned all of his pyrotechnics customer contact information through his employment at PSI. (Deposition of Steven Souza ["Steven Souza Depo"] 30:5–19, 32:17–20, Dkt. No. 45–1 at 14–15.) Defendant's access to the company database was limited to the "Booking Form" program. (Dkt. No. 37 at 2.)

Shortly after being hired, on November 8, 1995, defendant signed a document titled "Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities—1994" which provided in part:

> Account executives agree that all account or customer lists, trade secrets, unique display designs or knowledge gained are the exclusive property of Pyro Spectaculars, Inc. and the Account Executive hereby waives any rights therein. Account Executives further agree that they will not divulge any knowledge, trade secrets, formulas, patents or unique display designs to anyone outside Pyro Spectaculars, Inc.

(Dkt. No. 46 at 26–30, ¶ 12.) During his employment, defendant also signed and acknowledged multiple versions of PSI's employee handbook, including the PSI Employee Handbook issued November 2008, which plaintiff received on November 30, 2008 and signed on December 5, 2008. (*See e.g.* dkt. nos. 45–2 at 9, 45–3 at 36.) Section One of the PSI Employee Handbook issued November 2008 provides, in part:

> The protection of confidential business information and trade secrets is vital to the interests and the success of Company. Such confidential information includes, but is not limited to, the following examples:
> - Computer processes
> - Computer programs and codes
> - Customer lists
> - Customer preferences

- Financial information
- Marketing strategies
- New materials research
- Pending projects and proposals
- Proprietary production processes
- Scientific data
- Scientific formulae
- Technological data

All employees may be required to sign a non-disclosure agreement as a condition of employment. Employees who improperly use or disclose Company trade secrets or confidential operational business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

(Dkt. No. 45–4 at 2–3.) Section 7 of that handbook also states, in pertinent part, that:

Employees are responsible for all Company property, materials, or written information issued to them or in their possession or control. Employees must return all Company property immediately upon request or upon termination of employment. Company may take all action deemed appropriate under the law to recover or protect its property issued to employees.

(Dkt. No. 45–4 at 36.) By signing the acknowledgment of receipt of handbook form, defendant acknowledged that he read and understood all of its provisions. (Dkt. No. 45–3 at 36.)

Around the first week of December 2011, defendant decided in his own mind to resign from PSI. (Steven Souza Depo 77:2–9, Dkt. No. 45–1 at 38.) However, he must have been seriously considering such a move as somewhat before that, in November 2011, defendant downloaded and printed 52 individual customer Booking Forms from the Booking Form program. (Dkt. Nos. 37 at 4 & 37–1.) In discussions with his then-prospective new employer and PSI competitor, J & M Displays/Hi–Tech FX, LLC, defendant projected that he could bring approximately $500,000–$600,000 in client revenue to the table, 70–80% of which would be attributable to existing PSI customers. (Steven Souza Depo 139:5–10, 140:15–25, 145:10–20, 147:22–148:5, Dkt. No. 46 at 9–10, 13–15.) Defendant later acknowledged that J & M Displays/Hi–Tech FX, LLC had only a few customers in Northern California prior to his resignation from PSI. (Steven Souza Depo 137:25–138:2, 138:22–24, 143:19–144:15, Dkt. No. 46 at 7–8, 11–12.) He also stated that he had not heard of J & M Displays prior to J & M Displays recruiting him, was not aware of any advertising by J & M Displays in California, and that J & M Displays were not hiring any other sales people in California apart from defendant. (Steven Souza Depo 154:6–19, Dkt. No. 45–2 at 1.)

Defendant actually tendered his resignation on January 14, 2012, to be effective on January 16, 2012. (Dkt. No. 3–2 at 2.) On January 16, 2012, he allegedly informed PSI Assistant Office Manager, Cindy Allie, that he had no other employment lined up. (Dkt. No. 3–5 at 2.) However, by that time defendant had already signed an employment contract with J & M Displays/Hi–Tech FX, LLC[3] on January 14, 2012, which actually overlapped his employment with PSI by two days. (Steven Souza Depo 173:14–175:4, Ex. 30, Dkt. Nos. 45–2 at 3–5 & 46 at 31–34.) Defendant purport-

---

3. Defendant's employment agreement is technically with Hi–Tech FX, LLC. (Dkt. No. 46 at 31–34.) However, J & M Displays is apparently the parent company of Hi–Tech FX, LLC and defendant is designated as the Vice Presi-dent of the West Coast Region for J & M Displays West. (See Dkt. No. 36–1.) Accordingly, the court refers to both entities as defendant's employers.

edly told Ms. Allie that she may not want to keep in touch with him after he takes business away from PSI. (Dkt. No. 3–5 at 2.) Defendant's wife, Sherry Souza, also informed a PSI employee that she hated defendant's family and that defendant and her would "take as many shows as we can." (Sherry Souza Depo 35:20–37:7, Ex. 36, Dkt. No. 45–6 at 11–13, 28.)

Furthermore, shortly after defendant's resignation, PSI started receiving reports from some of its customers that defendant had been contacting them and soliciting their business on behalf of his new employers. (Dkt. Nos. 3–1 at 2; 3–3 at 2–3; 3–7 at 2–3; 3–8 at 6–7; 36 at 3–4; 36–1.) Mark Silveira, PSI's Madeira Facilities Manager, also reported that, around mid-December 2011, defendant had asked him who built PSI's fireworks racks, adding that he was starting his own company and looking for a supplier. (Dkt. No. 3–3 at 2.)

In light of this information, PSI retained a computer forensics expert to analyze defendant's former PSI-assigned laptop. The forensics report indicated that, on January 14, 2012 (the date of his resignation), defendant transferred over 60 PSI files from his PSI-assigned laptop to a Western Digital external hard drive and to additional USB drives. (Dkt. Nos. 3–6 at 3–4; 24 at 2–3.) Thereafter, a wiping software called "Disk Redactor" was used to delete and write over several computer files on the PSI-assigned laptop. (Dkt. No. 3–6 at 4–5.) It was later established that defendant retained the services of a computer expert to help him delete various files and folders from his PSI-assigned laptop. (Dkt. No. 45–6 at 44–55.) Despite the deletion, the computer forensics expert was able to recover the names of some of the files transferred, which were mostly concerning specific PSI clients and projects. (Dkt. No. 3–6 at 4–5.)

Additionally, it is undisputed that defendant retained an older version of PSI's Booking Form program and accessed it after his resignation. (Steven Souza Depo 108:1–109:8, Dkt. No. 45–1 at 46–47.) He kept a separate Excel database of PSI customer and show information that was derived from PSI documents and databases. (Steven Souza Depo 38:4–40:15, Dkt. No. 45–1 at 17–19.) Defendant also admitted that he accessed and funneled information from PSI Booking Forms to Mark Johnson at J & M Displays to prepare proposals to customers on behalf of J & M Displays, even though defendant was no longer a PSI employee and knew that it was something he was not permitted to do. (Steven Souza Depo 110:15–112:14, Dkt. No. 46 at 4–6.) Defendant further testified as follows:

Q. And how many proposals did you make in January after you left?

A. Probably 20.

Q. And how were you able to make so many proposals so quickly?

A. Get my information and—I didn't make the proposal. J & M—Mark at J & M made the proposal. I fed him the information. He could probably put out four or five, six a day out of their system.

(Steven Souza Depo 206:3–11, Dkt. No. 46 at 23.) This deposition testimony was further corroborated by PSI's computer forensics expert, whose analysis of one of defendant's personal computers revealed multiple contracts and proposals from J & M Displays to PSI customers within 2 weeks of defendant's resignation from PSI. (Dkt. No. 38 at 2.) Some of these proposals from J & M Displays had a similar format to PSI's previous proposals and offered slightly more product for the same budget. (Dkt. No. 45 at 3.)

Defendant also testified that he called, e-mailed, and visited several PSI customers in person since he resigned from PSI, using the above-mentioned Excel database

of PSI customer information. (Steven Souza Depo 115:19–24, 116:14–117:2, Dkt. No. 45–1 at 48–50; Steven Souza Depo 155:2–16, Dkt. No. 45–2 at 2; Dkt. No. 45–5 at 51; Steven Souza Depo 200:17–201:5, Dkt. No. 46 at 19–20.) Defendant's wife, Sherry Souza, who is herself a pyrotechnics operator and has shot shows for PSI in the past, assisted defendant with addressing and mailing cards to customers. (Sherry Souza Depo 28:19–30:25, Dkt. No. 45–6 at 5–7; Dkt. No. 49 at 1, 3.) She also indicated that she had discussions with individuals at J & M, including Brian Panther and Mark Johnson, regarding expenses for a pyrotechnics show for a former PSI customer. (Sherry Souza Depo 32:2–33:25, Dkt. No. 45–6 at 8–9.)

PSI claims that, in the weeks since defendant's resignation, at least 6 of its customers have or may have signed contracts with J & M Displays. Moreover, J & M Displays is apparently offering a 5% increase in product for the same price if a customer is willing to sign a multi-year agreement. (Steven Souza Depo 204:4–23, Dkt. No. 46 at 22.) PSI contends that unless defendant is enjoined, his conduct will continue to damage PSI's business, goodwill, and reputation.

## BRIEF PROCEDURAL HISTORY

PSI filed this action on February 3, 2012. (Dkt. No. 2.) The operative complaint asserts claims for violation of the Computer Fraud and Abuse Act (claim based on federal law); violation of California Penal Code section 502; breach of contract; breach of loyalty; breach of the implied covenant of good faith and fair dealing; misappropriation of trade secrets; tortious interference with prospective economic relationship and economic advantage; unfair business practices; and conversion. (Dkt. No. 2.) Several rounds of applications for expedited discovery followed. After the parties conducted expedited discovery, including computer forensic examinations and depositions, PSI filed the instant motion for a preliminary injunction which is focused upon the trade secrets state law claim.

On March 16, 2012, after the hearing on PSI's motion for a preliminary injunction, the court issued an interim injunctive order pending issuance of a final order on the motion for a preliminary injunction. (Dkt. No. 92.) That order essentially required defendant to collect all PSI documents, databases, and information in his actual or constructive possession, or the actual or constructive possession of those acting in concert with him or in active participation with him, and produce these to chambers. It also required defendant to certify in a declaration that no copies of PSI documents, databases, and information remain in his actual or constructive possession, or the actual or constructive possession of those acting in concert with him or in active participation with him, including but not limited to Sherry Souza, Mark Johnson, Brian Panther, J & M Displays and its officers and employees, and Hi–Tech FX, LLC and its officers and employees. (Id.) [4]

The court now proceeds to a complete analysis of the merits of PSI's motion and the formulation of a final preliminary injunction.

## DISCUSSION

### Applicable Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Instead, it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at

---

4. For the specific requirements imposed by that order, the parties shall reference the court's March 16, 2012 order. (*See* Dkt. No. 92.)

22, 129 S.Ct. 365. "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1127 (9th Cir.2009) (quoting *Winter,* 555 U.S. at 20, 129 S.Ct. 365). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24, 129 S.Ct. 365 (internal quotations omitted).

■ A Ninth Circuit panel has found that post-*Winter,* this circuit's sliding scale approach or "serious questions" test survives "when applied as part of the four-element *Winter* test." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131–32 (9th Cir.2011). "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1132, 1135.

### Likelihood of Success on the Merits

■ PSI first argues that it is likely to succeed on the merits of its claim of misappropriation of trade secrets. Under the California Uniform Trade Secrets Act ("CUTSA"), "misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ.Code § 3426.1(b). Either subsection (2)(B)(ii) or (iii) is applicable here. "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ.Code § 3426.1(a). CUTSA authorizes courts to enjoin "[a]ctual or threatened misappropriation." Cal. Civ. Code § 3426.2(a).

Defendant's briefing confirms there is no dispute that defendant downloaded and retained PSI documents and information after his resignation. Nor is there any dispute that he funneled PSI documents and information, including PSI Booking Forms, to his new employer to formulate proposals to PSI customers. Thus, assuming for the moment that the information constituted a trade secret, the element of misappropriation is satisfied, because defendant disclosed and used PSI documents and information without its consent, knowing that his acquisition of such information gave rise to a duty not to unduly disclose it, or was acquired by virtue of his former status as a PSI employee. Indeed, defendant's counsel conceded at oral argument that the only issue is whether the information.constitutes a trade secret.

For purposes of CUTSA, a trade secret is defined as follows:

[I]nformation, including a formula, pattern, *compilation*, program, device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d) (emphasis added).

Defendant argues that PSI's Booking Forms and Booking Form program contain information that is generally known to the public and not secret, and that PSI does not protect the information on its Booking Form program. Both contentions will be addressed separately below.

*Secrecy of Information*

◼ Although PSI's Booking Form program also contains pyrotechnics operator and vendor information, the parties address most of their briefing to the secrecy of the specific customer information contained on individual Booking Forms and the program as a whole.

In *Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731 (1997), the California Court of Appeal for the First District extensively summarized California law with respect to when a customer list can be protected as a trade secret:

With respect to the general availability of customer information, courts are reluctant to protect customer lists to the extent they embody information which is readily ascertainable through public sources, such as business directories ... On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information

to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers ... As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret ... The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a substantial business advantage ... In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested ... Its use enables the former employee to solicit both more selectively and more effectively.

*Id.* at 1521–22, 66 Cal.Rptr.2d 731.

Defendant asserts that PSI's customer identities are widely known throughout the industry and easily ascertainable. "A competitor can easily find very long lists of customers of PSI through a very simple and swift search on Google. A competitor certainly could contact the Fire Marshall's office, call customers and operators, contact local fire jurisdictions or agencies, but this is not necessary, as the Internet offers such a speedy method of learning the identities of such a large number of entities that have purchased shows from PSI." (Dkt. No. 47, Def.'s Opp. at 10–11.) In support of these assertions, defendant's and his wife's declarations attach numerous permit applications and related documentation for PSI pyrotechnics shows done for private and

public entities in various counties obtained through public records requests. (*See e.g.* Dkt. No. 48, Exs. B–G; Dkt. No. 49, Ex. G.) The permit applications show relatively detailed information regarding individual shows, including plot plans, customer names and contacts, as well as shell counts and descriptions. (*Id.*) Sherry Souza's declaration also attaches PSI proposals, contracts, and city council meeting minutes regarding shows put on for public entities found on the Internet, and these documents often include the prices PSI charged for these shows. (Dkt. No. 49, Ex. F.) Furthermore, defendant points out that PSI itself provides information about its shows and customers on its website. (Dkt. No. 49, Ex. H.)

To be sure, if the identities and contact information of PSI's customers, operators, and vendors were the only information at issue, the court would be inclined to agree with defendant. It is not very hard to determine which entities regularly have fireworks shows, and these shows are often widely publicized. It is also probably true that one can ascertain the names of all licensed pyrotechnics operators in California, and that the names and contact information for pyrotechnics vendors are available in public directories. However, the true value of PSI's Booking Form program lies in its comprehensive, if not encyclopedic, compilation of customer, operator, and vendor information, both with respect to each individual customer Booking Form and in the aggregate.

As outlined above, it includes contact information for the "contact person" at each customer; detailed financial, costs, and budgeting information for shows; a breakdown of the specific products used in individual shows; customer special preferences and requirements; notes of customer complaints and how a customer's shows can be improved; as well as information regarding operators and Hazardous Materials Drivers, including their experience, training, qualifications, and requirements. (*See* Dkt. No. 36 at 3.) PSI compiled this information "over the decades of its business from advertising, website contacts, publicity, customer referrals, and other sources of leads that have been gathered and forwarded to its account executives, including Defendant, to make a sale for PSI." (*Id.*) It has been "developed at great expense and labor" and "gives PSI a competitive advantage in the industry." (*Id.*)

While defendant persuasively argues that many of the individual pieces of information in the Booking Forms program can be ultimately ascertained by requesting and scouring public records, calling customers and operators, and reverse engineering videos and CDs, that misses the point. The Booking Forms program provides a virtual encyclopedia of specific PSI customer, operator, and vendor information at a competitor's fingertips, allowing the competitor to solicit both more selectively and more effectively without having to expend the effort to compile the data. *Morlife, Inc.,* 56 Cal.App.4th at 1522, 66 Cal.Rptr.2d 731. It is this type of compilation that may be entitled to trade secret protection. Another federal district court reached the same conclusion in a case involving remarkably similar facts and allegations:

"Customer lists containing merely public information that can easily be compiled by third parties will not be protected as trade secrets; however, where the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection ... While the information contained on the lists and the notes is ultimately ascertainable from public sources, it is not readily ascertainable

from public sources: A third party wishing to duplicate the information could not do so without investing a significant amount of time, effort, and expense...."

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F.Supp.2d 1057, 1062–63, 1066 (D.Kansas 2001) (involving former employee of a pyrotechnics company who started his own competing business).[5]

Finally, defendant's argument that all of the information on PSI's Booking Forms is readily available to the public is undercut by his own actions in this case. If the information is truly that readily available to the public, it raises the question of why it was necessary for defendant to surreptitiously download, retain, and funnel the Booking Forms and other PSI information to his new employer in the first place.

Accordingly, the court finds that PSI's Booking Forms and the Booking Forms program likely "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." Cal. Civ.Code § 3426.1(d).

*Efforts to Maintain Secrecy*

■ To establish that its Booking Forms and Booking Form program are trade secrets, PSI must also show that they are "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." Cal. Civ.Code § 3426.1(d).

PSI points out that it requires its employees to sign confidentiality agreements, maintains its confidential information remotely on secure network servers, requires employees to use passwords with minimum complexity requirements to access the company database, and compartmentalizes data and limits access by geographic region and job function. (Dkt. No. 37 at 2–3.) PSI acknowledges that until March 2011, its older versions of the database software were housed directly on PSI computers, thereby allowing defendant and other employees to download and store Booking Form information directly on their computer hard drives. (Dkt. No. 37 at 3.) After recognizing the danger of this practice, PSI developed the new database system to house confidential information remotely. (*Id.*) The new software seeks older versions of the software and customer information on employee computers and removes it. (*Id.*)

Defendant disputes that PSI protects the information on the Booking Form program. By reference to his own declaration and the declarations of several former PSI employees and operators, defendant points to alleged lax security practices by PSI. For example, defendant states that many employees used their first names as their login and password to the Booking Form program and that PSI did not instruct employees not to share passwords. The network servers were purportedly not kept behind locked doors. PSI allegedly did not sufficiently restrict access to the Booking Form program—printouts were some-

---

5. While not dispositive of the issue, the court observes that defendant's employment agreement with his new employer also recognizes much of the above-mentioned information as confidential business information. (*See* Steven Souza Depo, Ex. 30, Dkt. No. 46 at 31–34 (*"Confidential Business Information* includes (i) information related to the promotion, sale, design, production or manufacture of the Company's products and services; (ii) information related to the Company's processes, inventions and formulas (including inventions and formulas developed by the Employee during employment with the Company); (iii) information related to the Company's customers, including customers' special requirements; and (iv) any other proprietary information that gives the Company the opportunity to obtain a competitive advantage over competitors").)

times left lying around or not shredded, receptionists and some temporary employees were allowed access, and on one occasion a receptionist allegedly provided several Booking Forms to an independent contractor. Additionally, PSI allegedly did not always ensure that electronic and paper copies of its confidential information were returned by departing employees. Furthermore, defendant argues that PSI provides most of the information in its Booking Forms to independent contractor pyrotechnic operators in their operator packets, with the exception of costs and financial information. An operator packet includes a work order, plot plan, permit application, customer contact information, cue sheets, show music, fire jurisdiction information, a route plan for transportation, an equipment list, the bill of lading, and the material safety data sheet. Operators do not sign a confidentiality agreement, share the operator packet information with their crew members (who are not hired or approved by PSI), and often do not return these materials. (*See* Dkt. Nos. 48–49, 51–52, 54–61.)

While PSI's security practices are not perfect and these issues can certainly be explored further in discovery and at trial, the court finds for purposes of this motion that PSI has made reasonable efforts to maintain the secrecy of the information in its Booking Form program. As an initial matter, many of the statements in the former employees' declarations regarding PSI's internal practices were conclusory and of doubtful probative value given that most of these former employees had not worked for PSI for several years or after PSI upgraded its software. In fact, several now work for PSI competitors.

Moreover, even if the court were to unquestioningly accept the facts proffered by defendant and these former employees, a business is not required to turn itself into an "impenetrable fortress" to protect its trade secrets. *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1017 (5th Cir.1970); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.1993) (finding that entity took reasonable steps to insure the secrecy of information by requiring its employees to sign confidentiality agreements regarding trade secrets). PSI required defendant and other PSI employees to sign confidentiality agreements as well as acknowledgments that they had received and read PSI's employee handbook, which outlines the employee's obligations with respect to trade secret and confidential business information. (Dkt. No. 45–2 at 9; Dkt. No. 45–3 at 36; Dkt. No. 46 at 26–30, ¶ 12; Dkt. No. 86, Exs. A–F.) The unauthorized actions by some employees do not negate reasonable efforts to maintain the confidentiality of its proprietary information. *See E.I. duPont deNemours & Co.*, 431 F.2d at 1017 ("We should not require a person or corporation to take unreasonable precautions to prevent another from doing that which he ought not do in the first place.")

Additionally, although defendant makes much of the information provided to operators in the operator packets, he concedes that operators were not provided costs, budgeting, and other financial information regarding the customer, which here arguably constitutes the most dangerous information to fall into the hands of a competitor. Moreover, an operator's access to information regarding a particular show is not comparable to having access to the entire Booking Form program database (or at least for Northern California and Hawaii customers).

Therefore, the court finds, for purposes of this motion, that there is substantial evidence that defendant misappropriated PSI's trade secrets, including PSI Booking Forms and other proprietary information.

Accordingly, the court concludes that PSI is likely to succeed on the merits of its misappropriation of trade secrets claim. In light of this conclusion, it is unnecessary for the court to consider at this junction whether PSI is likely to succeed on any of its other claims in this litigation.

*Likelihood of Irreparable Harm*

The court also finds that PSI has demonstrated that it is likely to suffer irreparable harm in the absence of a preliminary injunction. Ordinarily, economic injury is not considered irreparable, because monetary damages are available as an adequate remedy. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991). However, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id.*; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.2001) (holding that evidence of threatened loss of prospective customers or goodwill supports a finding of irreparable harm).

Here, defendant admitted that he funneled PSI documents and information, including PSI Booking Forms, to his new employer to formulate proposals to PSI customers. This conduct explicitly targets PSI's goodwill, and therefore supports the existence of irreparable harm. According to PSI, at least 6 customers have already transferred their accounts to J & M Displays and/or Hi–Tech FX, LLC. Furthermore, damage to a business's goodwill is often very difficult to calculate. *MySpace, Inc. v. Wallace*, 498 F.Supp.2d 1293, 1305 (C.D.Cal.2007). Therefore, the court finds that PSI will likely suffer irreparable harm in the absence of a preliminary injunction.

*Balance of the Equities*

The court has already found that PSI is likely to suffer irreparable harm if injunctive relief is not awarded. As discussed in greater detail below, in light of the restrictions of Cal. Bus. & Prof.Code § 16600, any injunction issued would be focused on preventing defendant from unlawfully using PSI's trade secrets to solicit PSI's customers. Such an order would not cause any significant hardship to defendant, because it would essentially only require him to abide by existing law regarding the unauthorized use of another's trade secrets. Subject to certain restrictions discussed below, defendant and his new employer will be allowed to lawfully compete with PSI. In any event, whatever harm defendant may suffer by such a narrow injunction is slight when compared to the intangible harm PSI would suffer in losing the goodwill of its customers built up with great effort over many years. Accordingly, the court finds that the equities tip significantly in favor of PSI.

*Public Interest*

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24, 129 S.Ct. 365. There are two competing public interests at issue in this case. On the one hand, California has a "settled legislative policy in favor of open competition and employee mobility," protecting "the important legal right of persons to engage in businesses and occupations of their choosing." *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 946, 81 Cal.Rptr.3d 282, 189 P.3d 285 (2008). On the other hand, the state also has a strong policy in favor of protecting trade secrets. *Retirement Group v. Galante*, 176 Cal.App.4th 1226, 1237, 98 Cal.Rptr.3d 585 (2009) ("An equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer"). As one California Court of Appeal put it, "[t]o be sure, we acknowledge

the important legal right of persons to engage in businesses and occupations of their choosing ... Yet also fundamental to the preservation of our free market economic system is the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation protected from the gratuitous use of that 'sweat-of-the-brow' by others." *Morlife, Inc.,* 56 Cal.App.4th at 1520, 66 Cal.Rptr.2d 731.

Although an overbroad injunction would interfere with California's policy in favor of open competition, employee mobility, and the right to pursue a business or occupation, the court finds that an injunction specifically focused on preventing misuse of PSI's trade secrets to solicit PSI's customers would serve the policy of protecting trade secrets while simultaneously allowing lawful competition.

In sum, PSI has shown a likelihood of success on the merits, that irreparable harm is likely in the absence of an injunction, that the balance of equities tips significantly in PSI's favor, and that the public interest favors issuing injunctive relief. What remains to be decided is who will be bound by the injunction, the scope of the injunctive relief, and whether a bond should be posted.

*Persons to be Bound by the Injunction*

■ Under Fed.R.Civ.P. 65(d)(2), an injunction may bind "only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Defendant may obviously be bound by any injunction as a party to the action. However, although

PSI has filed an application to amend its complaint to add J & M Displays, Hi–Tech FX, LLC, Mark Johnson, and Brian Panther as defendants (dkt. no. 68), that application is still under submission, and these entities and individuals cannot presently be bound as parties.[6]

Nevertheless, as outlined above, the court finds that substantial evidence exists that defendant's new employers, Hi–Tech FX, LLC and J & M Displays were acting in concert and in active participation with defendant in accessing, obtaining, and/or using information from PSI documents and databases, including PSI's Booking Form Program. (*See e.g.* Steven Souza Depo 110:15–112:14, Dkt. No. 46 at 4–6; Deposition of Mark Johnson, 86:11–94:15, Dkt. No. 66–1 at 15–23.) Accordingly, Hi–Tech FX, LLC and J & M Displays and their officers and employees, including but not limited to Mark Johnson and Brian Panther, may be enjoined.

The court further finds that defendant's wife, Sherry Souza, was acting in concert and in active participation with defendant. She is a pyrotechnics operator who has shot shows for PSI in the past, and she admitted that she assisted defendant with soliciting customers after his resignation from PSI. (Sherry Souza Depo 28:19–30:25, Dkt. No. 45–6 at 5–7; Dkt. No. 49 at 1, 3.) She also indicated that she had discussions with individuals at J & M, including Brian Panther and Mark Johnson, regarding expenses for a pyrotechnics show for a former PSI customer. (Sherry Souza Depo 32:2–33:25, Dkt. No. 45–6 at 8–9.) As such, Sherry Souza may also be enjoined.

*Scope of Injunctive Relief*

■ As noted above, the court already issued an interim injunctive order essen-

---

**6.** Indeed, all involved with Souza, and Souza himself, almost appear to be flaunting their misappropriation.

tially requiring collection, production, and the subsequent destruction of any remnants of all PSI documents, databases, and information in defendant's actual or constructive possession, or in the actual or constructive possession of those acting in concert or active participation with defendant (including Sherry Souza, Mark Johnson, Brian Panther, J & M Displays and its officers and employees, and Hi-Tech FX, LLC and its officers and employees), as well as requiring a certifying declaration to that effect. (*See* Dkt. No. 92.) That interim injunctive order will be incorporated in the court's final injunctive order and will remain in full force and effect.

PSI further requests that the court enjoin defendant from doing business with any PSI customer he learned of through his employment at PSI. (*See* Dkt. No. 97 at 2.) In light of this request, the court specifically invited the parties to submit supplemental briefing with respect to the import of Cal. Bus. & Prof.Code § 16600 [7] and *Retirement Group v. Galante*, 176 Cal. App.4th 1226, 98 Cal.Rptr.3d 585 (2009).

In *Galante*, the plaintiff TRG, an investment firm, sued the defendants, some of its former affiliate advisors, who had established a competing business, for misappropriation of trade secrets, which the defendants allegedly used to solicit the plaintiff's customers. *Id.* at 1229, 98 Cal. Rptr.3d 585. TRG obtained a preliminary injunction enjoining numerous categories of conduct. *Id.* at 1232, 98 Cal.Rptr.3d 585. Category 3 of the injunction enjoined defendants from "using in any manner TRG information found solely and exclusively on TRG databases. However, similar information found on servers, databases and other resources owned and operated by other entities or businesses is excluded from the injunction." *Id.* at

1232, 98 Cal.Rptr.3d 585. Category 4 of the injunction prohibited the defendants from "directly or indirectly soliciting any current TRG customers to transfer any securities account or relationship from TRG to [defendants] or any broker-dealer or registered investment advisor other than TRG." *Id.* On appeal, the defendants challenged only the injunctive relief granted by Category 4, asserting that it violated *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 81 Cal.Rptr.3d 282, 189 P.3d 285 (2008).

The *Galante* court considered the two "competing strands of legal principles" in California involving competitive conduct by a former employee. *Id.* at 1233, 98 Cal. Rptr.3d 585. First, the court examined Cal. Bus. & Prof.Code § 16600 and the California Supreme Court's relatively recent *Edwards* decision. *Galante*, 176 Cal. App.4th at 1233–36, 98 Cal.Rptr.3d 585. It noted that *Edwards* had rejected the "rule of reasonableness" in evaluating competitive restraints utilized in other jurisdictions, i.e. the principle that only broad agreements that prevent a person from engaging entirely in his chosen business, trade, or profession violate Cal. Bus. & Prof.Code § 16600. *Id.* at 1235, 98 Cal. Rptr.3d 585 (*citing Edwards*, 44 Cal.4th at 947–48, 81 Cal.Rptr.3d 282, 189 P.3d 285). It further noted that *Edwards* had declined to adopt the related "narrow-restraint" exception discussed by the Ninth Circuit in *Campbell v. Board of Trustees of Leland Stanford Junior University*, 817 F.2d 499 (9th Cir.1987). *Galante*, 176 Cal. App.4th at 1235, 98 Cal.Rptr.3d 585 (*citing Edwards*, 44 Cal.4th at 948, 81 Cal.Rptr.3d 282, 189 P.3d 285). *Edwards* had observed that, by concluding that California courts have excepted from Cal. Bus. &

---

[7]. Cal. Bus. & Prof.Code § 16600 provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

Prof.Code § 16600 agreements that bar one from pursuing only a small or limited part of the profession, the *Campbell* court had confused the import of California case law. *Id.* at 1236, 98 Cal.Rptr.3d 585 (*citing Edwards,* 44 Cal.4th at 949–50, 81 Cal.Rptr.3d 282, 189 P.3d 285). The *Galante* court acknowledged that "[a]lthough *Edwards* reaffirmed the broad California rule that invalidates noncompetition agreements falling outside the statutorily-prescribed exceptions, *Edwards* expressly stated it was not addressing the applicability of the so-called trade secret exception to section 16600." *Id.* (citing *Edwards,* 44 Cal.4th at 946 n. 4, 81 Cal.Rptr.3d 282, 189 P.3d 285.)

Second, the *Galante* court stated that "[a]n equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer." *Galante,* 176 Cal. App.4th at 1237, 98 Cal.Rptr.3d 585. However, it emphasized that "a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information* to solicit those customers … Thus it is not the *solicitation* of the former employer's customers, but is instead the *misuse of trade secret information,* that may be enjoined." *Id.* (emphasis in original)

The *Galante* court then synthesized the "competing strands" as follows:

> We distill from the foregoing cases that section 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business, but a court may enjoin *tortious* conduct (as violative of either the Uniform Trade Secrets Act

and/or the Unfair Competition Law) by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer. Viewed in this light, therefore, the conduct is enjoinable *not* because it falls within a judicially-created "exception" to section 16600's ban on contractual nonsolicitation clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking.

*Galante,* 176 Cal.App.4th at 1238, 98 Cal. Rptr.3d 585 (emphasis in original).

In light of these principles, the *Galante* court concluded that the injunctive provisions of Category 4 "on its face violate *Edwards* and when viewed in counterpoise with the injunctive provisions of Category 3, cannot rationally be upheld as an injunction limited in scope to the only legitimate protection (i.e., enjoining the misappropriation of TRG's trade secrets) for which injunctive relief may be issued." *Galante,* 176 Cal.App.4th at 1238, 98 Cal.Rptr.3d 585. It noted that, "absent the provisions of Category 4, [the defendants] could compete with TRG for the business of TRG's existing customers by employing all available resources and information *except* for those materials (because it is found 'solely and exclusively on TRG's databases') constituting protectable trade secrets. Accordingly, Category 4 adds nothing to further the legitimate scope of protections (e.g. protection of TRG's trade secrets) to which TRG is entitled, and can only operate to preclude the precise type of competition *Edwards* declares is otherwise permissible." *Id.* at 1239, 98 Cal.Rptr.3d 585.

In its supplemental briefing, PSI contends that *Galante* is distinguishable, because it only considered whether a preliminary injunction could be entered in the

context of specifically enforcing a non-solicitation agreement in a contract. PSI argues that Cal. Bus. & Prof.Code § 16600 is not even triggered here, because PSI is not seeking to enforce a contractual non-solicitation agreement, but instead seeks a remedy for defendant's likely violation of CUTSA, and that Cal. Bus. & Prof.Code § 16600 does not constrain a court in equity from fashioning an appropriate remedy for tortious conduct. (*See* Dkt. No. 96.)

While Category 4 of the injunction in *Galante* may have been at least partially based on a contractual non-solicitation agreement,[8] the court declines to adopt such a narrow reading of *Galante. Galante* extensively discussed law concerning misappropriation of trade secrets by an employee and emphasized that the protection afforded in such cases should focus on preventing the *misuse of trade secret information,* not the *solicitation* of former customers. *Galante,* 176 Cal.App.4th at 1237, 98 Cal.Rptr.3d 585. The opinion centered around how a court might provide appropriate relief via an injunction, and the *Galante* court never stated that injunctions not based on contractual clauses are entirely exempt from the policies embodied in Cal. Bus. & Prof.Code § 16600. While Cal. Bus. & Prof.Code § 16600 does not constrain a court in equity from fashioning an appropriate remedy focused on the misappropriation of trade secrets, *Galante* nevertheless stands for the proposition that a court should be highly cognizant of the important policies embodied in Cal. Bus. & Prof.Code § 16600 when crafting an injunction.[9]

Accordingly, the court will not impose the overbroad restriction proposed by PSI, enjoining defendant "from doing business with any PSI customer he learned of through his employment at PSI." (Dkt. No. 97 at 2.) This is not a case involving a secret recipe or formula, where the mere use of that recipe or formula in competition with a former employer in itself would constitute misappropriation of a trade secret. Instead, as discussed above, the identities and contact information of PSI's customers are, in most cases, ultimately available to the public or a competitor. Thus, the court cannot grant the broad relief requested. Nevertheless, for the reasons discussed below, the court concludes that a narrow, time-limited non-solicitation restriction is necessary to prevent defendant's misuse of PSI trade secret information in competing with PSI.

First, given defendant's past conduct, the court has some concern that defendant will not return all PSI trade secret and proprietary material pursuant to this court's order. On February 8, 2012, the court ordered defendant to produce all of defendant's and defendant's wife's computers and other electronic storage media (including, without limitation, external hard drives, thumb drives, Iphones, Blackberrys, etc.) for forensic examination no later

---

8. Although the *Galante* court focused its analysis on the language of the injunction and never extensively discussed the underlying non-solicitation agreement, it did refer to it when comparing it to the agreement at issue in *Edwards. See Galante,* 176 Cal.App.4th at 1234, 98 Cal.Rptr.3d 585 ("There, the employee (Edwards) signed a nonsolicitation agreement, substantively indistinguishable from the non-solicitation agreement in this case....")

9. PSI also argues that Cal. Bus. & Prof.Code § 16600 by its terms only applies to contracts. While this is true, the California Supreme Court has also indicated that "California settled public policy in favor of open competition, and rejected the common law rule of reasonableness, when the Legislature enacted the Civil Code." *Edwards,* 44 Cal.4th at 945, 81 Cal.Rptr.3d 282, 189 P.3d 285. PSI has cited no authority for the proposition that this court may ignore established California policy in fashioning an injunction premised on California law.

than February 14, 2012. (Dkt. No. 15 at 6.) The court further ordered defendant to file a declaration stating that all applicable devices were turned over and made available for forensic examination pursuant to the court's order and that there are no other applicable electronic storage media in their possession, custody, or control. (*Id.*)

However, to this day, defendant has failed to account for several thumb drives onto which (the forensic examination revealed) he transferred information from his PSI-assigned computer. (*See* Dkt. No. 24.) At his deposition, defendant also admitted that he had not turned over all computers that he had in his possession as of February 14, 2012. (Steven Souza Depo 61:2–65:2, Dkt. No. 45–1 at 26–30.) In particular, he testified that although he had sold a computer to a Jeff Shin, Mr. Shin had returned the computer to him in September–October, 2011 to have a "worm" on the computer fixed and that he had used it to go online, do e-mail, and "do a little bit of work." (*Id.* at 62:2–63:9.) However, in his most recent declaration, defendant curiously asserts that he retrieved that computer from Mr. Shin after February 9, 2012 and turned it over to his counsel on February 24, 2012. (Dkt. No. 80 at 1.) These discrepancies, along with plaintiff's surreptitious downloading of PSI documents and files, use of wiping software, and subsequent destruction of electronic storage media cause the court to be skeptical that an injunction requiring defendant to return all PSI documents, databases, and information will be sufficient to protect against misuse of PSI's trade secrets. This skepticism is reinforced by the fact that defendant's probable misappropriation thus far has so tainted defendant's base of knowledge that it would be very difficult, at least over the next several months, for defendant to separate his general pyrotechnics information and skills from PSI's legitimate trade secrets when competing with PSI.

Accordingly, the court will enjoin defendant, for a period of six months from the date of this order, from directly or indirectly *initiating* contact with any current Northern California and Hawaii PSI customers with whom he had contact or for whose accounts he had responsibility while employed by PSI, for the purpose of encouraging, inviting, suggesting, or requesting transfer of their business from PSI. Notwithstanding the foregoing, if a PSI customer initiates contact with defendant, defendant shall be permitted to respond to and accept business from the customer. Defendant shall also be permitted to continue dealings with former PSI customers with whom defendant, J & M Displays, and/or Hi–Tech FX, LLC already have an existing contract for services. Defendant shall further be permitted to engage in marketing efforts directed at the pyrotechnics show market as a whole, such as attending trade shows and posting general advertisements.

Furthermore, these non-solicitation restrictions shall not apply to defendant's new employers *provided that defendant has no direct or indirect involvement or input in the solicitation of any PSI customers covered by this order.* It is defendant—not his new employers—who allegedly has significant relationships with PSI's customers and is best positioned to misuse PSI's trade secrets. Thus far, J & M Displays and Hi–Tech FX, LLC have not demonstrated that they are unwilling to obey the court's orders. Given that these employers have been required to produce all PSI documents, databases, and information in their actual or constructive possession that can potentially be misused, the court finds it unnecessary to further limit their competitive efforts. To the extent that proposals from J & M Displays

and Hi–Tech FX, LLC have already been actually communicated to PSI customers covered by this order with defendant's input or assistance, but no agreement has yet been finalized, J & M Displays and Hi–Tech FX, LLC may conclude those deals without any further involvement or assistance by defendant.[10]

The court emphasizes that it is not imposing the non-solicitation component of the injunction as an exception to the principles outlined in *Galante*—instead it is entirely consistent with those principles. *Galante* and *Edwards* have both acknowledged that non-solicitation restrictions may sometimes be necessary as long as it is focused on protecting against the misuse of trade secrets. *See Galante,* 176 Cal. App.4th at 1240, 98 Cal.Rptr.3d 585; *Edwards,* 44 Cal.4th at 946, 81 Cal.Rptr.3d 282, 189 P.3d 285. The necessity of such a restriction necessarily turns on the facts of an individual case. The court notes that other federal district courts, with due regard for *Galante* and Cal. Bus. & Prof. Code § 16600, have sometimes found such narrow non-solicitation clauses appropriate to prevent the misuse of trade secrets. *See e.g. Richmond Technologies, Inc. v. Aumtech Business Solutions,* 2011 WL 2607158 (N.D.Cal. July 1, 2011); *Fidelity Brokerage Services LLC v. McNamara,* 2011 WL 2117546 (S.D.Cal. May 27, 2011).

Finally, the court notes that PSI also requests the appointment of a special master or monitor to ensure compliance with this court's injunction. Although PSI at the hearing discussed the possibility of requiring defendant to somehow report his daily competitive activities to the court, PSI first raised the issue of appointment of a special master or monitor in its supplemental briefing. It also suggests that defendant should be responsible for the costs involved with such an ap-

pointment. Defendant has had no opportunity to respond to PSI's proposal. In any event, the court finds that such an appointment would be unnecessarily expensive and is not warranted at this stage of the litigation. The discovery process in civil litigation is quite often a sufficient way to monitor non-compliance with preliminary injunctions.

*Propriety of a Bond*

 Fed.R.Civ.P. 65(c) provides, in part, that "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In this case, the narrow injunction to be entered will not preclude defendant from working in his chosen occupation. With respect to the six-month non-solicitation restriction, defendant will be permitted to work with J & M Displays or Hi–Tech FX, LLC customers and potential customers that are not covered by the terms of the injunction during that period. J & M Displays and Hi–Tech FX, LLC will even be permitted to solicit PSI customers covered by the non-solicitation restriction without defendant's involvement. There is also no present evidence that defendant has been terminated, or will be terminated, from J & M Displays or Hi–Tech FX, LLC. Accordingly, no bond will be required. However, should defendant's employment circumstances change, defendant will be permitted to return to the court to request the imposition of an appropriate bond.

*CONCLUSION*

Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED THAT:

---

10. Of course, PSI may seek damages from Souza, and/or added defendants, if use of PSI trade secrets were improperly part of the solicitation process.

1. PSI's motion for a preliminary injunction (dkt. no. 34) is granted in part.

2. The court's interim injunctive order issued March 16, 2012 (dkt. no. 92) is hereby incorporated and remains in full force and effect, except as supplemented and/or modified by this order.

3. Defendant Steven Souza and those who have been identified as working in active participation or in concert with him (including Sherry Souza, Mark Johnson, Brian Panther, J & M Displays and its officers and employees, and Hi–Tech FX, LLC and its officers and employees) are enjoined from possessing, using, disclosing, or transmitting any PSI trade secrets or proprietary information, including but not limited to the contents of PSI's Booking Forms and Booking Form program. This does not include any information or documentation that defendant and those acting in active participation or in concert with him have acquired entirely independent of PSI documentation and databases utilized by defendant Steven Souza, or funneled by defendant Steven Souza, to the above-mentioned persons or entities.

4. Defendant Steven Souza is enjoined, for a period of six months from the date of this order, from directly or indirectly *initiating* contact with any current Northern California and Hawaii PSI customers with whom he had contact or for whose accounts he had responsibility while employed by PSI, for the purpose of encouraging, inviting, suggesting, or requesting transfer of their business from PSI. Notwithstanding the foregoing, if a PSI customer initiates contact with defendant, defendant shall be permitted to respond to and accept business from the customer. Defendant shall also be permitted to continue dealings with former PSI customers with whom defendant, J & M Displays, and/or Hi–Tech FX, LLC already have an existing contract for services. Defendant shall further be permitted to engage in marketing efforts directed at the pyrotechnics market as a whole, such as attending trade shows and posting general advertisements.

5. The non-solicitation restrictions identified in paragraph 4 above shall not apply to J & M Displays, Hi–Tech FX, LLC, and their officers and employees *provided that defendant has no direct or indirect involvement or input in the solicitation of any PSI customers covered by this order.* To the extent that proposals from J & M Displays and Hi–Tech FX, LLC have already been actually communicated to PSI customers covered by this order with defendant's input or assistance, but no agreement has yet been finalized, J & M Displays and Hi–Tech FX, LLC may conclude those deals without any further involvement or assistance by defendant.

6. PSI's counsel shall immediately provide notice of this order and injunction to all those found by the court to be in active concert with, or in active participation with, defendant Souza.

IT IS SO ORDERED.